# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

QUINTINA DESCHENIE,
GLORIA JEAN TODACHEENE, and
PATRICIA EMRICK,

       Plaintiffs,

v.                                            Civil No. 03-1226 WJ/DJS

BOARD OF EDUCATION OF CENTRAL
CONSOLIDATED SCHOOL DIST. NO. 22,
RANDY J. MANNING, individually and in his
capacity as School Board President,
GARY D. RAY, individually and in his
capacity as School Board Vice President,
STANLEY R. KING, individually and in his
capacity as School Board Secretary,
LINDA BESETT, individually and in her
capacity as Superintendent of Schools,
JAY MORTENSEN, individually and in his
capacity as Assistant Superintendent of Schools, and
DENNIS NICHOLSON, individually and in his
capacity as Assistant Superintendent of Schools,

       Defendants,

## MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT AS TO PLAINTIFF DESCHENIE

THIS MATTER comes before the Court upon Defendants' Motion for Summary Judgment as to Claims of Quintina Deschenie, filed January 10, 2005 (**Doc. 85**). Plaintiffs allege that Defendants retaliated against them for speaking out on matters of public concern, in violation of their First Amendment rights. Having considered all the pleadings, memoranda and other materials submitted by the parties, as well as the applicable law, I find that Defendants' motion is well-taken and will be granted.

## Background

Plaintiffs in this case are present and former employees at Central Consolidated School District ("CCSD"), which is located largely within the Navajo Indian Reservation.  In this action, Plaintiffs allege that Defendants engaged in a policy and practice of discouraging or preventing speech which questions the use of funds designated for Navajo bilingual or special education, or which questions CCSD's compliance with program requirements or use of program funds.

## I.      Procedural History

The Court recently granted summary judgment to Defendants as to all of Plaintiff Emrick's claims, and all of Plaintiff Todacheene's claims. See, Docs. 109 and 112.  As a result, Plaintiff Deschenie is the sole remaining Plaintiff in this action.  This motion seeks dismissal of Plaintiff Deschenie's First Amendment claim against Defendants.[1]

In a previous Order, on Defendants' Motion to Dismiss, the court narrowed some issues of liability on the part of the Board of Education ("Board" or "School Board") and Board members.  Doc. 31 (Mem. Opin. & Order, 5/26/04).   Deschenie's claims against Defendants are asserted against:  (1) Defendant Besett individually; (2) the Board members individually and officially; and (3) the School Board itself based on the actions of Besett as School Superintendent of CCSD and final policymaker for the Board.  See, Doc. 31 at 12 (emphasis added).  Defendants Jay Mortensen ("Mortensen") and Dennis Nicholson ("Nicholson") are assistant Superintendents of CCSD.   The Board members are Defendants Randy Manning ("Manning"), Gary Ray ("Ray") and Stanley King ("King") as respectively, the President, Vice President and Secretary of the School Board.

---

[1]  Plaintiff's due process claim was dismissed previously by the Court.  See, Doc. 31 at 19-20.

## II.    Factual History

The Court sets out the facts according to what is undisputed by the parties, and where disputed, in a light most favorable to Plaintiff as the non-moving party.  Reed v. McKune, 298 F.3d 946, 949 (10th Cir. 2002).  Plaintiff Deschenie ("Deschenie") worked at the CCSD from August 28, 2000 until November 21, 2003 as an administrator.  Her title was Director of Indian Education and Bilingual Education until June 30, 2003.  After that date her title was Director of Bilingual Education.

The allegations in this case are fueled by what was at the time a sensitive issue for the school district -- the Navajo bilingual program, which was part of the CCSD curriculum. Plaintiff's alleged instances of protected speech occurred within a time period from August 7, 2002 to April 30, 2003.  On August 7, 2002, Manning spoke at an administrator's retreat and made comments regarding the bilingual education program.  Manning referred to the program as a "sacred cow" that had to be looked at, and proposed that changes be made to the program in kindergarten through third grade.  One of Manning's suggestions was to immerse children who were English deficient for three years in English, between K-3, which was allowed under the Federal No Child Left Behind bilingual program.  Pltff's Ex.: Manning Depo. at 18.   After the presentation, Deschenie spoke to Manning and expressed disagreement with his comments. Deschenie believed Manning wanted to eliminate the bilingual education program.  Pltff's Ex." Deschenie Depo at 21:1-4.  Parties dispute whether the intentions of Manning and the School Board were to eliminate or modify the program, but this dispute is not relevant to Plaintiff's First Amendment claim.  Deschenie's comments to Manning at this meeting is her first alleged instance

of protected speech.[2]

On August 16, 2002, Deschenie wrote a letter to Manning, which Defendants deny he received.  Plaintiff contends that she sent the letter to Manning by e-mail.   This is the second instance of alleged protected speech. On October 7, 2002, Deschenie attended an Indian Education Committee meeting in her capacity as a school administrator.  At that meeting, Plaintiff expressed concerns that the program was not meeting standards and was not adequately supported within the District, and spoke in favor of including Navajo language and culture in the curriculum.  Plaintiff alleges that her speech at this meeting is a third instance of alleged protected speech.  At this meeting, Manning clarified his position on bilingual education.  Manning expressed a concern that bilingual education was a factor in students' low reading test scores, but made it clear that he did not intend to do away with the Navajo bilingual program.

On December 15, 2002, Deschenie wrote a guest column in the Farmington newspaper as a school official.  Besett approved the column prior to publication.  On April 30, 2003, Deschenie wrote a letter to the editor in which she was identified as a school administrator.  No approval was received by Besett prior to the submission of the letter.  These letters to the newspaper are Plaintiff's fourth and fifth instances (the last) of alleged protected speech.  Parties dispute whether the School Board ever adopted a policy on dealing with the media, which Defendants contend was accomplished on August 20, 2002.

It is undisputed that as Director of Bilingual Education, it was Deschenie's responsibility to make sure the applications were submitted in a timely fashion.  Deschenie Depo. at 11: 4-7. On May 12, 2003, Besett received an e-mail from Dr. Kathryn Sherlock at the New Mexico State

---

[2]  In order to help with the narrative flow of the facts, a more detailed discussion of Plaintiff's "speech" at this meeting, as well as other alleged instances of protected speech will be presented in the Court's discussion on that subject, below.

Department of Education which indicated that bilingual education funding applications originally due on April 25, 2003 had not been received from Deschenie despite an extension.  This placed district funding in jeopardy.

On May 15, 2003, Deschenie made a presentation to the School Board on bilingual education.  At that presentation, Deschenie was questioned by the Board about the April 30, 2003 letter to the editor.  On May 28, 2003, Deschenie filed a grievance because of the Board's questions to her on May 15, 2003.

On May 29, 2003, Besett discussed with Deschenie a proposal that would divide her position of Director of Indian Education (or Indian Education Coordinator) and Bilingual Education into two positions and Deschenie would become Director of Bilingual Education.  The other position would be for an Indian Education Coordinator.  Plaintiff attributes a retaliatory motive to the job modification, while Defendants contend that Besett was concerned about Deschenie's ability to perform the duties of both positions.

On June 2, 2003, Besett responded to Deschenie's grievance and listed seven expectations of Deschenie which included respecting rights of others, working with central office administrators, maintaining clear clines of communication and meeting deadlines on applications. Manning also responded to the grievance and apologized to Deschenie for the manner in which he spoke to her.

The bilingual applications Deschenie had submitted were rejected. On June 27, 2003, Besett notified Deschenie of her displeasure regarding the rejection.  On June 28, Besett discussed with Deschenie revisions to the rejected applications, and interviews for the Indian Education Coordinator.   Two days later, on July 1, 2003, Deschenie's  position officially became that of

Bilingual Education Director.  That same day, Besett prepared a growth plan which identified Deschenie's unsatisfactory performance in managing resources, working productively with others and adherence to established timelines and procedures.

On July 16, 2003, Besett received a phone call from Jeff Johnson at the U.S. Department of Education regarding the application for Title VII Indian education funds in which Johnson expressed concern that the application deadline of July 23, 2003 would not be met by Deschenie. If the deadline was not met, the district risked the loss of 1.3 million dollars in funding.  Deschenie did not assist in the final preparation and submission of this application and Besett shortened a vacation to prepare the application.

On July 18, 2003, Deschenie did not attend a bilingual education meeting which she herself had scheduled regarding the problems with the bilingual funding applications.   Around this time, Besett directed Deschenie to review all bilingual funding applications prior to resubmission on July 31, 2003.  Deschenie later told Besett that she did not have time to review the applications.  On August 20, 2003, Besett received a memo from Dr. Sherlock stating that sixteen bilingual education applications had been rejected a second time.  One other application was incomplete.  That same day, Besett met with Deschenie to review the growth plan and expressed concerns regarding her untimely submission of requests for funds, her failure to meet with administrators regarding bilingual education and her lack of coordination with principals regarding resubmission of bilingual applications.   Deschenie disputes Besett's justification for concerns, stating that she did coordinate the process with the principals by scheduling a training session for them and offering them her full support.  At the same time, however, Plaintiff admits that it was her responsibility to make sure the applications were submitted in a timely fashion.  Deschenie

Depo. at 11: 4-7.

The bilingual applications were submitted on September 10, 2003.  Eleven schools were "Approved Upon Amendment," five schools were not approved, and one school application was not received.  On September 26, 2003, Besett gave Deschenie a set of tasks to complete as soon as possible: to serve as interpreter for work sessions and board meetings; to ensure te bilingual program was in compliance with state regulations, to develop a plan to have every student's file checked for a home language survey; to compile a list of students who have English only spoken at home; to compile list of students without home language surveys and to determine who is providing bilingual services at schools.  Deschenie was also instructed to compile a list of students in the bilingual program and the amount of time the students spent in the program by October 6, 2003 in order to meet the 40-day count deadlines of October 10th and October 13th.

Also on September 26, 2003, the school district was notified that two school applications had not been approved and two school applications were "Approved Upon Amendment."  On October 9, 2003, the deadline for the tasks assigned by Besett had not been met and Besett contacted Deschenie requesting the information.  Deschenie provided that information at the close of business on October 9th, but two schools' data were missing.  On October 16, 2003, Besett served Deschenie a letter outlining performance issues which needed correction.  On October 20, 2003, Besett met with Deschenie and provided specific instructions on assignments.  These assignments were not completed.  Plaintiff contends that the volume of tasks was unrealistic was intended to cause Deschenie to fail.  Plaintiff notes that she did manage to timely complete several of the assigned tasks.   On November 12, 2003, Besett notified Deschenie that she would be discharged.  Parties dispute whether the School Board took action on Deschenie's employment.

7

In the response brief, Plaintiff adds an assortment of facts which are either speculative or immaterial. Having addressed similar First Amendment claims of two other Plaintiffs in this suit, the Court is aware that the background issues in this case – Navajo education and in particular Navajo bilingual education -- had polarized the local community into those who wanted to modify the bilingual program, and others who feared that the suggested modification threatened the very existence of the program. Plaintiff includes facts which might help explain the hostility between the two groups, but which have little use in Plaintiff's First Amendment inquiry. For example, Plaintiff presents as a "material fact," Plaintiff states that the community's attention to Defendant Manning's remarks about the bilingual program may have been "compounded" because Manning's brother Byron (not a defendant in this case) had instituted an English language-only policy in the District's administrative office. Even if this were an accurate statement of fact, it is not material to Plaintiff's retaliation claim. At most, this fact supports Defendants' contention that the school district was experiencing problems with the community because of a misunderstanding of its position on bilingual education (a contention which Plaintiff disputes). Statement of Material Fact ("SMF") 12. Otherwise, it is not material that Byron Manning worked in the same school district as Defendant Manning and Plaintiff. The conduct of Defendant Manning's brother has no bearing on whether Plaintiff engaged in protected speech, nor does it advance the inference that Defendant *Randy* Manning retaliated against Plaintiff. The Court will therefore omit references to such statements of fact except for contextual use.

**Legal Standard**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of material fact is "genuine" if a reasonable jury could return a verdict for the nonmoving party.  Moya v. U.S.A. et al, 35 F.3d 501, 503 (10th Cir. 1994), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  In applying this standard, the Court construes all inferences arising from the record in favor of the nonmovant. Stinnett v. Safeway, Inc., 337 F.3d 1213, 1216 (10th Cir. 2003).  The nonmovant must establish, at a minimum, "an inference of the existence of each element essential to her case."  Hulsey v. Kmart, Inc., 43 F.3d 555, 557 (10th Cir. 1994)).

Once the defense of qualified immunity is raised, the plaintiff bears the burden of establishing that the defendant has violated clearly established law.[3]  Hovater v. Robinson, 1 F.3d 1063, 1066 (10th Cir. 1993).  To reach the question of whether a defendant official is entitled to qualified immunity, a court must first ascertain whether the plaintiff has sufficiently asserted the violation of a constitutional right at all.  Martinez v. Mafchit, 35 F.3d 1486, 1490 (10th Cir. 1994).  This requires the district court to first determine whether the plaintiff's allegations, if true, state a claim for a constitutional right that was clearly established at the time the defendant acted. Bisbee v. Bey, 39 f.3d 1096, 1100 (10th Cir. 1994). For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).

Once the plaintiff makes the required showing, the public official assumes the usual

---

[3]  The defense of qualified immunity is not available to entities, such as a school board, based on the good faith of its members.  See, Key v. Rutherford et al, 645 F.2d 880, 883 (10th Cir.1981); Seamons v. Snow, 206 F.3d 1021, 1029 (10th Cir. 2000) (Qualified immunity is not available as a defense to municipal liability) (citing Owen v. City of Independence, 445 U.S. 622, 638 (1980)).

summary judgment movant's burden of showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. Hinton v. City of Elwood, Kan., 997 F.2d 774, 779 (10th Cir. 1993) (cited in Howard v. Dickerson, 34 F.3d 978 (10th Cir. 1994)); Fed.R.Civ.P. 56(c).  Specifically, the public official must show that no material issues of fact remain as to whether his or her actions were objectively reasonable in light of the law and the information he or she possessed at the time.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Defendants have set out the legal standard for the qualified immunity defense, but have not applied the standard to any specific issues in the First Amendment inquiry, as though inviting the Court to apply the defense where applicable.[4]  The Court will therefore not apply this standard to any issue not raised by Defendants. See, Perry v. Woodward, 199 F.3d 1126, 1141 n. 13 (10th Cir.1999) (observing that court will not craft argument for party).

### Discussion

To prevail on her claim of retaliation, Plaintiff must prove that (1) her speech is protected under the First Amendment and (2) the speech was a substantial or motivating factor behind the adverse employment decision.  Conaway v. Smith, 853 F.2d 789, 795 (10th Cir.1988) (citing Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).   Once Plaintiff meets that burden, Defendants may avoid liability by showing that they would have made the same decision in the absence of the protected activity.  Childers v. Independent Sch. Dist. No. 1 of Bryan County, Okla., 676 F.2d 1338, 1341 (10th Cir.1982).

---

[4]  The only issue on which Defendants offer a specific argument for the defense of qualified immunity is on Plaintiff's unidentified general statements of protected speech.  Mem. Brf. at 19.

Deschenie alleges that she suffered retaliation by Defendants because she engaged in several instances of protected speech.  Defendants contend that Plaintiff's speech is not protected, that not all of the alleged employment actions taken are adverse, and that Plaintiff cannot show a causal relationship between the alleged speech and any adverse action Defendants took, even if Plaintiff's speech was protected.

**I.        Whether Plaintiff's Speech was Protected**

A two-part inquiry is used to determine whether a public employee's speech warrants constitutional protection:  (1) whether the speech relates to matters of public concern, <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983);  and (2) whether the interests of the public employee in commenting on matters of public concern outweigh the interest of the government employer "in promoting the efficiency of the public services it performs through its employees," <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968).   If the employee's speech does not touch on a matter of public concern, the court need not engage in the <u>Pickering</u> balancing analysis.  <u>Connick</u>, 461 U.S. at 146.   The determination of whether a public employee's speech warrants constitutional protection is a question of law to be resolved by the court on a motion for summary judgment.  <u>Lee v. Bd. of Cty. Commissioners of Arapahoe Cty, Colo et al.</u>, 18 F. Supp.2d 1143, 1157 (D.Col. 1998) (citation omitted).

A.        <u>Whether speech involved public concern</u>

To determine whether employee speech touches on a matter of public concern, we look at whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community."  Connick, 461 U.S. at 146.  When the content of the speech focuses on disclosing public officials' malfeasance or wrongdoing, it is likely to be considered a matter of

public concern.  Wulf v. City of Wichita, 883 F.2d 842, 857 (10th Cir.1989) (citations omitted).

Conversely, speech is generally not protected if the aim is simply to air grievances of a purely

personal nature.  Id.  To determine if the speech related only to internal personnel matters and

not to the discharge of governmental responsibilities, the Court must consider the "content, form,

and context of a given statement, as revealed by the whole record."  Connick, 461 U.S. at 147-48.

The Court should also look at the motive or subjective intent of the speaker "to learn if the

speech was calculated to redress personal grievances or to address a broader public purpose."

Patrick v. Miller, 953 F.2d 1240, 1248 (10th Cir.1992).  The pertinent inquiry is whether the

actor is speaking as a citizen or an employee.  Connick, 461 U.S. at 147.

     1.      *August 7, 2002: comments to Manning at administrators' retreat*

     Plaintiff's expression of disagreement with Manning's comments about bilingual education

does not amount to speech which relates to public concern.  Not all workplace speech by

government employees involves matters of public concern.  Connick, 461 U.S. at 149.

Deschenie's disagreement with what she perceived to be a suggestion to discontinue bilingual

education in grades K-3 does not become a matter of public concern because New Mexico law

requires local school boards to have bilingual multicultural education programs as part of the

regular academic program.  Deschenie's speech did not touch on malfeasance or noncompliance

by the school district, but merely expressed personal disagreement.  Plaintiff's follow-up letter to

Manning on August 16th does not change the character, content or form of the speech Plaintiff

made on August 7th.

     2.      *August 16, 2002: letter written to Manning after the retreat*

     In this letter, Plaintiff provided Manning with a review of the bilingual education program,

including: some of the problems facing the program, concerns relating to individuals schools in implementing the program, and inadequate pay and turnover among the bilingual teaching staff. Ex. to SMF 9; Set 1, p. 0087.[5]  The parties dispute whether Manning actually received the letter, which Plaintiff contends she sent by e-mail.  There is nothing on either party's exhibit, either by way of letterhead or e-mail routing information, that would indicate the letter was actually sent. However, even viewing Plaintiff's factual allegations favorably, the issue is not material, since the Court does not find that the letter does not touch on matters of public concern for purposes of First Amendment protection.

In order to determine whether speech is entitled to First Amendment protection, the Court looks not only at the content of the speech, but the form and context of the speech.  The letter does not disclose or complain of official wrongdoing or malfeasance.  Further, from the tone and substance of the letter, Plaintiff is speaking as an employee -- the director of the bilingual program -- and not as a citizen speaking out on a broader public purpose.  Speech made in the course of an employee's official duties is not speech on a matter of public concern.  See, Morfin v. Albuquerque Public Schools, 906 F.2d 1434 (10th Cir. 1990) (citing   Koch v. City of Hutchinson, 847 F.2d 1436 (10th Cir. 1988)).  Thus, the August 16th letter is not speech on a matter of public concern.

   3.   *October 7, 2002: comments at an Indian Education Committee ("IEC") meeting*

Manning repeated his criticisms of bilingual education at an IEC meeting in October. Plaintiff describes her speech as follows:

_____

   [5] "Set 1" and "Set 2" are part of Plaintiff's separately filed combined exhibits, numbered sequentially.

> I took issue with some of his statements, defended the accountability of the program, expressed concerns that the program was not meeting standards and was not adequately supported within the District, and spoke in favor of including Navajo language and culture in the curriculum.

Ex. to SMF 2 (Answer to Interrogatory No. 12).  Plaintiff also emphasized the importance of teaching Navajo language and culture to students and that including culture as part of the bilingual program was consistent with state policy.  Pltff's Set 2, pp. 885-86 (Transcript of October 7, 2002 IEC meeting). Defendants argue that Deschenie was speaking as an employee in this public setting, and that the statements relate to management of the program and therefore are not matters of public concern.  Because Deschenie was director of the bilingual education program, her speech could be viewed as related to her position as an employee.  On the other hand, there is no evidence that either Plaintiff's attendance or comments at the meeting were an expected part of her job duties.  Viewing the inferences of the situation favorably to Plaintiff, Deschenie's comments at the October 6, 2002 IEC meeting could arguably be considered as touching on matters of public concern.

4.      *December 14, 2002:  guest column published in the Farmington Daily Times*

Plaintiff wrote a guest column in response to a news article published in the Daily Times the previous month (not included in parties' exhibits).  The article was entitled "Language program is valuable to Diné people," in which Deschenie expressed general support for the program.  The article described the qualifications and duties of Navajo Language teachers and the reporting requirements for the bilingual education program.  In the article, Deschenie emphasized the role of Navajo language instruction in the CCSD curriculum and recognized that more adequate staffing would resolve some of the problems the program was facing.  Ex. to SMF 13.

14

Defendants contend that the column is not a matter of public concern entitled to First Amendment protection because it was not critical of the district and was approved by Besett prior to its publication.  Plaintiff argues that it is protected by the First Amendment because it "deals with" important issues about the importance of the bilingual program.  To be protected speech, the expression must "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." Witham v. Baptist Health Care of Okla, Inc., et al., 98 F.3d 581  (10th Cir. 1996).  While the article does not focus on disclosing public officials' malfeasance or wrongdoing, Deschenie's statements can be considered as helpful in informing the public about the values of the bilingual education program and the issues facing the program, rather than simply touching on personal employment matters.  Thus, I find that this speech should proceed to a balancing inquiry.

5.    *April 30, 2003: letter to editor published in the Farmington Daily Times*

In this letter, Plaintiff thanked the Daily Times' editorial writers for printing an article which Plaintiff considered to be "public validation" for the importance of teaching Navajo language and culture in the schools.  The letter continues:

> We know we're doing the right thing for our own kids when we teach them Navajo language and Navajo culture, but it sure is a lonely battle when the powers-that-be knock the job!
> I have to constantly reassure my staff that they are in the right, because they feel so battered down at times by the criticism and challenge in our system.
> Ahéhee'!

Ex. to SMF 14.  Deschenie submitted the letter by e-mail which indicated her school position. Deschenie believes she did not submit the letter as a school official and her identification as a school official by the newspaper was a mistake.  However, Besett did not have a problem with the

letter's publication.

In determining whether a public employee's speech touches on matters of public concern or only deals with personal employment matters, the Court looks to the subjective intent of the speaker. Schalk v. Gallemore, 906 F.2d 491, 495 (10th Cir.1990); Workman v. Jordan, 32 F.3d 475, 483 (10th Cir. 1994), cert denied, 514 U.S. 1015 (1995). The Court finds that the letter expressed support and concern for the teaching of the Navajo language and culture, and thus was a matter of public concern.

6.    *General claims of protected speech*

Plaintiff also based her claims of protected speech on general comments she made about the importance of the Indian Education and Bilingual programs, the rights of native Americans and the school district's compliance with Navajo employment laws. The Court cannot analyze the content, context and form of amorphous claims of protected speech. Neither are such claims sufficient to satisfy Plaintiff's burden on summary judgment. Hardy v. S.F. Phosphates Ltd Co., 185 F.3d 1076, 1080 (10th Cir. 1999) (on summary judgment, a plaintiff must simply raise a genuine issue of material fact on each element of the prima facie case).

B.    Balancing inquiry

The second step in determining whether Plaintiff's speech is protected under the First Amendment proceeds under a balancing inquiry. The objective of the Court's analysis under Pickering is to "arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563 at 568. Pickering directs a court to consider a number of factors in balancing the competing

16

interests at stake, such as the manner, time and place of the employee's expression as well as the context in which the dispute arose.  Connick, 461 U.S. at 152-53.  Other pertinent considerations include "whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987).

The Court has determined that Plaintiff engaged in protected speech on three instances: Deschenie's October 7, 2002 comments made at an IEC meeting; the December 14, 2002 guest column published in the Farmington Daily Times; and the April 30, 2003 letter to the editor.  I have considered whether it would be appropriate to analyze these instances separately for the balancing inquiry.  Where the speech involves multiple instances but only one subject,

> the question of whether speech should be balanced separately is fact sensitive and depends on how interrelated are the different aspects of the speech. Factors that could be considered in determining whether the speech is interrelated include the time frame in which the speech occurred, the different audiences to which the speech may have been directed, the continuity of the speech, and the degree to which the different aspects of speech built upon each other to create a cumulative impact on the state employer.

Johnsen v. Independent School Dist. No. 3 of Tulsa County, Okl. 891 F.2d 1485, 1492 (10th Cir. 1989).  Two of Deschenie's instances of speech occurred within a comparatively narrow time frame (October 7th and December 14th, 2002), and remained consistent in its purpose and theme. The April 30th letter to the editor could almost be considered a follow-up of the December 14th column in terms of the continuity of the content and context of the speech.  However, there is an important undisputed factual distinction concerning the April 30th letter which the Court finds precludes it from being considered as a whole with the other two instances.

17

Defendants have not presented any convincing evidence to tip the balance in their favor with regard to Plaintiff's speeches from October 7, 2002 and December 14, 2002. They contend that there was a disruption within the community based on a misperception of the Board's policy on bilingual education.  In response to this, the Board issued a policy reinstating its official position (Ex. to SMF 8), and Manning clarified the position stating that the program would be improved but not eliminated.  Defendants argue that Deschenie's statements regarding the feared demise of the program were inaccurate and that therefore her statements should be accorded little weight in the balancing inquiry.  See, Lytle v. City of Haysville, 138 F.3d 857 (10th Cir. 1998) (an employee's interest in whistle blowing entitled to little weight if reasonable person would not have believed there was corruption or wrongdoing).

It is undisputed that Deschenie was aware of the Board's official policy and of Manning's position on the issue of improving the bilingual education program.  However, there is evidence that even though Plaintiff knew the Board's intention was to improve the bilingual education program, Plaintiff did not believe that the suggested modifications would improve the program. Deschenie Depo. at 28-29.  In fact, Manning's suggestion could be viewed as espousing the elimination of the program for certain grade levels.  Manning Depo. at 18:14-17 ("we could do English only between K-3 and then teach all the Navajo we needed to from 4 on. . . ."). Therefore, the Court cannot find as a matter of law that Deschenie's statements were inaccurate to a degree where they should be discounted in a balancing inquiry.  Further, Defendants fail to identify any detrimental effect Plaintiff's speech had either on the school's efficiency or in the harmony between coworkers.  Besett stated that the publicity and criticism about the district with regard to the bilingual and Indian education program was "a distractor at times" but not harmful

18

to the school district.  Besett Depo. at 194.  Therefore, a balancing inquiry tips in favor of Plaintiff's speaking out on matters of public concern, but only as to the October 7, 2002 and December 14, 2002 speeches.

The April 30, 2003 letter to the editor does not survive the balancing inquiry.  Although Deschenie disputes whether the Board adopted a policy on dealing with the media on August 20, 2002, her own understanding of the policy in place was that an employee needed to clear statements made on behalf of the district, but that making personal statements did not need to be cleared with a supervisor.  Deschenie Depo. at 57.  Plaintiff does not dispute that the letter, which was submitted by e-mail, indicated her school position, but contends that her identification as a school official was a mistake.  However, the letter loses the balancing inquiry even when viewing the facts favorably to Plaintiff.  The letter as printed in the newspaper, identified Deschenie as "Director of Indian Education and Bilingual Education, Central Schools, Kirtland."  A copy of the e-mail as generated by Plaintiff identified her as "Tina Deschenie, CCSD."  Exs. to SMF 14.

Given that the school district was dealing with misperceptions and conflict within the community on the issue of Indian education and the bilingual program at the time, Defendants had an important stake in ensuring that statements representing the official position of the school were cleared with the administration.  Therefore, I find that the letter to the editor which was published in the Farmington Daily Times on April 30, 2003 weighs in favor of Defendants on a balancing inquiry under Pickering because Defendants' interest in promoting the efficiency of its public educational services outweighs Plaintiff's right of expression.

## II.   Adverse Action Under the First Amendment

Having determined that Deschenie engaged in some protected speech, the next step is to

determine whether Plaintiff suffered an adverse employment action as a result of making such speech.  The Tenth Circuit liberally defines the phrase "adverse employment action,"  Sanchez v. Denver Public Schools, 164 F.3d 527, 532 (10th Cir. 1998) and takes a case-by-case approach in determining whether a given employment action is adverse.  Gunnell v. Utah Valley State College, 152 F.3d 1253, 1264 (10th Cir. 1998).  The Tenth Circuit has held that "deprivations less harsh than dismissal" can violate a public employee's rights under the First Amendment. Schuler v. City of Boulder et al, 189 F.3d 1304, 1309 (10th Cir. 1999).  However, the Tenth Circuit has never ruled that "all such acts, no matter how trivial, are sufficient to support a retaliation claim." Lybrook v. The Members of the Farmington Municipal Schools Board of Education, 232 F.3d 1334, 1340 (10th Cir. 2000). In other words, "there may be some minor adverse actions that would not constitute First Amendment violations."  Id., 232 F.3d at 1340.

A        Whether Defendants Took Adverse Action against Plaintiff

        Defendants argue that of the numerous minor adverse actions Plaintiff identified in her Answers to Interrogatories (Ex. to SMF 2, Ans. to Interrog. No. 12), only two actions are of significant magnitude which could be considered adverse under a First Amendment analysis: (1) Plaintiff's position reclassification on July 1, 2003 from Director of Indian Education and Bilingual Education to Director of Bilingual Education, and (2) her discharge on November 12, 2003).   Plaintiff apparently does not disagree with Defendants' assessment of the listing of adverse actions from Plaintiff's Answers to Interrogatories, since Plaintiff responds to Defendants' argument by ignoring that list, and instead presenting a revised list of eight allegedly adverse actions, the last of which includes the job reclassification ("demotion") and discharge challenged by Defendants.  Plaintiff's decision to abandon the original list of allegedly adverse

20

actions is wise.[6]   I agree with Defendants that many of the actions listed as adverse in

---

[6]   Acts or omissions of retaliation are listed as follows in Plaintiff's Answer to Interrogatory No. 8:

"      May 15, 2003: At a board meeting, when I was to present bilingual program applications, I was called up after 1:30 AM, nearly last on the agenda, and then yelled at by the board members and the superintendent;

"      May 29, 2003: The superintendent informed me my position of Director of Bilingual Education and Indian Education was not called Bilingual Coordinator, and she was advertising the position of Indian Education Coordinator;

"      May 29-30, 2003: After I gave the superintendent my written grievance she kept calling me asking questions and making comments that seems designed to intimidate me into withdrawing my grievance.  She informed me of a hearing date and time and then canceled it;

"      June 9, 2002: Besett took over approval of all requisitions for the bilingual and Indian education programs;

"      June 2003: The bilingual program applications were rejected.  I was blamed for the rejections, although I had previously informed the superintendent and board president about the problems involved;

"      July 1, 2003: Besett called me in and gave me a new evaluation and placed me on the first growth plan I had ever been on in all my years of employment.  She then verbally abused me;

"      July 15, 2003: Teachers at the July board meeting informed me that Dr. Besett had stated publicly that I had lost huge amounts of money in district funds;

"      July 27, 2003: I informed Besett the bilingual state department had informed me the bilingual applications were inadequate, they would not be approved without adding more TESOL endorsed teachers and navajo language teachers.  She refused my request the District hire more staff;

"      June 28, 2003: Dr. Besett requested I inform the Navajo nation JOM office that the revised JOM budget would not be sent to their office until a new Indian Education Coordinator was hired.  Dr. Besett later told the IEC I was totally to blame for the delay;

"      June 30, 2003: Besett disallowed pay for  the Navajo Language teachers' continued work on curriculum;

"      August 4, 2003: the superintendent and business manager made reports to the Indian Education Committee alleging I had lost a large amount of federal funds;

"      August 14, 2003: Besett told me I needed to send her and the assistant superintendents copies of all correspondence I had with principals;

"      August 15, 2003: I discovered I had been omitted from mailings to principals about topics having to do with the bilingual program;

"      August 16: at a principals meeting, Besett informed the principals that I was not willing to help the principals with their rejected bilingual applications;

"      September 2, 2003: the superintendent assigned the Kirtland Elementary school

Plaintiff's Answers to Interrogatories are inconsequential, even for First Amendment purposes.  I

principal, Raul Sanchez, to facilitate a meeting about the rejected bilingual applications;

" September 26, 2003:  Besett gave me an extensive list of items to complete.  One of the items instructed me to replicate the date keyed into the ADS system by clerks at the 17 school sites;

" August-November 2003:  every other day I was given new assignments.  I had to review student test scores to comply with Besett's assignments going back several school years.  I had to review student test scores to comply with Besett's assignments going back several school years.  I had to photocopy thousands of pages of bilingual applications and bilingual program policies and procedures to distribute to principals and teachers.  I had to rewrite and rewrite requests that I was submitted for Besett's approval, and everything had to first go through the Indian Ed coordinator.  I had to sit through multiple meetings with principals, going over their applications and test data and counting up individual student data;

" October-November 2003: my requests for assistance for Navajo Language teachers overburdened with required bilingual program testing were rejected;

" October 3, 2003: Besett assigned me to check test records for 595 students, for KMS and KCHS.  She informed me to go back at least 4 years;

" October 15, 2003: Besett called me in to her office where she, Nicholson and Mortensen were meeting and blamed me for errors in bilingual data;

" October 16, 2003: Besett gave me a negative letter about my employment;

" October 18, 2003:  I learned that Nicholson had said very negative and degrading things about me;

" October 20, 2003: Besett blamed me for KCHS having too many one-hour students and said they should be coded for 2 hours.  That coding would have been incorrect;

" October 20, 2003: principals and some of their secretaries called me informing me Besett's secretary was calling to check on my whereabouts in school buildings;

" October 20, 2003:  I received a memo asking that I should turn in the IEC meeting minutes and tapes which I no longer had anything to do with, since I had been reassigned from Indian Education Director in June (several months earlier). Before that, I had always made sure every meeting was thoroughly documented with minutes, and the secretary assured me the minutes were all in her filing cabinet;

" October 22, 2003: I was called in for another evaluation meeting and told my future employment status was pending review;

" October 23, 2003: the legislative Indian Affairs Subcommittee held a public hearing in Shiprock.  The legislators were falsely told there was no test data for the bilingual program;

" November 3, 2003: Besett rejected the testing plan and contract for subs to assist bilingual teachers with testing, which I had submitted to her;

" November 22, 2003: received letter of termination from my employment.

also note that some of the actions listed in the original group fit into one of the eight categories

presented by Plaintiff in the response brief:

- depriving Plaintiff of necessary support staff;
- thwarting specific program activities such as summer language class and Navajo language curriculum development ;
- numerous rebukes and reprimands;
- accusations of poor performance;
- accusations of spreading false information; and
- negative evaluations and placement on growth plans;
- demotion and removal of duties and responsibilities; and
- discharge.

Only the last two of the eight adverse actions enumerated by Plaintiff could be considered adverse

under the First Amendment.

### 1.    *Rebukes, reprimands and accusations (third, fourth and fifth categories)*

Plaintiff contends that she suffered adverse or detrimental employment actions by

numerous rebukes and reprimands, accusations of poor performance and accusations of spreading

false information The Court assumes that these allegations refer in part to the verbal

admonishment Plaintiff received on May 15, 2003, when she made a presentation to the Board on

bilingual education and was questioned at the time about the April 30, 2003 letter to the editor.

Defendants Ray and King considered the article to be critical of them.  They told Plaintiff that she

had no business writing to the paper, and were offended by the use of the phrase "powers that be"

in what they felt was Plaintiff's reference to them.  Ray and King told Plaintiff that they were

getting criticism from people about the article and were asked what their positions were on the

issue.  Deschenie stated that neither Besett nor Manning said anything to her about the article, and

that she was not issued any discipline because of the article.  Deschenie Depo at 54:18-25; 55:1-

25.

23

These comments by Ray and King, and any other verbal reprimands, rebukes or accusations do not rise to level of First Amendment adverse actions.   In <u>Hardeman v. City of Albuquerque, et al</u>., 377 F.3d 1106 (10th Cir. 2004), the Tenth Circuit held that public criticism of a government employee was not an adverse action.  <u>Id</u>. at 1118-19 ("We  have never found a First Amendment violation on the basis of disparaging comments alone"); <u>see also</u> <u>Lee v. N.M. Bd. of Regents</u>, 102 F. Supp.2d 1265, 1275 (D.N.M. 2000) (verbal admonishment is not adverse employment action) (citation omitted); <u>Phelan v. Laramie County Community College Bd. of Trustees</u>, 235 F.3d 1243, 1245 (10th Cir. 2000) (finding that Board's censure regarding plaintiff's placement of an advertisement in local paper encouraging the public to vote against the measure did not infringe any of plaintiff's free speech rights because it did not punish her for exercising these rights, nor would it deter her future speech).

     2.     *Support staff and program activities (first and second categories)*

Plaintiff offers no legal support, nor does the Court find any, for the proposition that an employer's refusal to hire support staff constitutes an adverse action under the First Amendment. Besett's purported intention to do so does not transform what is clearly an action to be carried out at an employer's discretion into an omission which is detrimental to an individual's employment.  Similarly, the Court fails to see how the "thwarting"of specific Indian education-related program activities (Plaintiff does not specify which Defendants allegedly did the "thwarting" or the nature of the "thwarting") has any effect on Plaintiff's employment, job duties or benefits to any degree.

     3.     *Negative evaluations and growth plans*

Plaintiff contends she suffered adverse actions when she received negative evaluations and

was placed on growth plans.  The standard evaluation form for CCSD employees lists fifteen skill categories, with a possible score of "1" or "2" for each category, "1" being Unsatisfactory, and "2" being Satisfactory.  A rating of "1" requires that a Growth Plan be developed.  A rating of "2" requires that a Refinement Plan be developed.  The form would seem to require a Growth Plan regardless of whether the employee received a single rating of "1" or whether the employee received ratings of "1" in all 15 categories.  See, Exs. to SMF 22.

On July 1, 2003, Deschenie was rated as unsatisfactory in three areas: managing resources, working productively with others and adherence to established timelines and procedures.  The corresponding growth plan listed recommended objectives to be improved, including the areas of preparation and revisions of the funding applications for which Deschenie was responsible.  Besett reviewed Plaintiff's progress on growth plan on August 20, 2003, and stated there was a "failure to initiate immediate and sincere efforts . . . may result in termination or discharge."   By September 22, 2003, Besett found that Plaintiff had made some progress toward the objectives but that "continued work is necessary." Exs. to SMF 22, 28, 32.  In a lengthy written review of Plaintiff's growth plan also dated September 22nd, Besett stated that the growth plan "will be reviewed again on or before October 31, 2003.  Failure to make substantial progress in meeting the objectives of your growth plan by that time *will* result in termination or discharge." Ex. to SMF 32.

While "deprivations less harsh than dismissal" can violate a public employee's rights under the First Amendment, the Tenth Circuit has "never ruled that *all* such acts, no matter how trivial, are sufficient to support a retaliation claim." Lybrook,232 F.3d at 1340.  In Lybrook, the Tenth Circuit held that a "Professional Development Plan" ("PDP") which appears to be very similar to

the growth plans in the present case, was not an adverse employment action under the First Amendment.  The plaintiff in Lybrook, who was also a teacher, was required under the plan to "[s]trive to create an atmosphere that will nurture collaboration with all colleagues" and to "conduct affairs with a conscious concern for the highest standards of professional commitment." The plaintiff was also required to meet with the principal every Monday morning.  Even so, the Tenth Circuit affirmed the district court's conclusion that the PDP and its consequences were of "insufficient gravity to premise a First Amendment violation."  232 F.3d at 1341.

Deschenie's evaluations and growth plans in themselves do not rise to the level of adverse employment actions.  Deschenie received an unsatisfactory rating in only three of the fifteen categories.  See, Fortner v. State of Kansas, 934 F.Supp. 1252 (D.Kan.1996), aff'd 122 F.3d 40 (10th Cir.1997) (performance reviews which are lower than previous reviews but still within satisfactory range do not constitute adverse employment actions), cited in Lee v. N.M. Bd. of Regents, 102 F.Supp.2d 1265, 1275 (D.N.M. 2000).  However, the warning to Plaintiff about possible dismissal or discharge could be characterized as adversely affecting one's employment if it were carried out for retaliatory motives.  Thus, although I find that the evaluations do not constitute adverse actions, I will discuss the termination warnings in the context of Plaintiff's discharge.

        *4 and 5.*        *Reclassification of Plaintiff's position ("Demotion"), and Discharge*

In July, 2003, Deschenie's position as Director of Indian Education and Bilingual Education was divided into two positions.  Deschenie would become Director of Bilingual Education.  Another individual would fill the new position of Indian Education Coordinator.  It is undisputed that this action was taken by Besett alone.  Modification of Plaintiff's job position

necessarily required that some of her job duties be removed.  See, e.g., Schuler, 189 F.3d at 1310 (reprimanding employee, transferring her to another location, and removing job duties from her constitute adverse employment actions in First Amendment context).  However, Plaintiff's salary remain unchanged after the reclassification.  Deschenie Depo. at 115.  Defendants apparently concede that Plaintiff's job reclassification constitutes one of those deprivations "less harsh than dismissal" which can be considered an adverse employment action.  Defendants also concede that Plaintiff's discharge qualifies as an adverse action.  Thus, the Court's subsequent analysis will be limited to the adverse employment actions of Plaintiff's job reclassification and discharge.

**III.    Whether Deschenie's Speech was Substantial or Motivating Factor in Action Taken**

In order to preclude summary judgment on her First Amendment claim, Deschenie must finally show a dispute of material fact as to whether her speech was a substantial or motivating factor behind the adverse employment decision.  Conaway v. Smith, 853 F.2d at 795.  Thus, Deschenie must present evidence to show that there is some connection between her the protected speech she made, and either her job reclassification or discharge. See, Hicks v. City of Watonga, 942 F.2d 737, 749 (10th Cir.1991) (to survive a summary judgment motion, a plaintiff must point to specific evidence showing the official's actions were improperly motivated (citing Lewis v. City of Ft. Collins, 903 F.2d 752, 755 (10th Cir.1990)).

A.    Temporal Proximity of Adverse Action to Protected Speech

Defendants argue that Plaintiff's speech was not a substantial or motivating factor behind her reclassification or discharge, and that the same actions would have been taken even in the absence of Plaintiff's speech.  Protected conduct closely followed by adverse action may justify an inference of retaliatory motive.  Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir.

27

1996).  Plaintiff's job reclassification occurred May 29, 2003 at the earliest, when Besett first

proposed the idea to Deschenie.  Plaintiff was notified of her discharge on November 12, 2003.

Except for the April 30, 2003 letter to the editor, none of Plaintiff's speech -- including speech

which the Court has previously found not to be protected by the First Amendment -- occurred

within a time period which might support an inference of retaliatory motive.  At best, the last

occurrence of speech (December 14, 2002) happened approximately six months from the earliest

adverse action (proposal of job reclassification on May 28, 2003), which is too remote in time

from a protected activity.  See, Anderson v. Coors Brewing Co., 181 F.3d 1171, 1178 (10th Cir.

1999) (three month period too long to show temporal proximity to establish causation); Schnuck,

121 F.3d at 1395 (holding four-month lapse between protected activity and adverse action

insufficient to justify inference of causation).

B.      Job Reclassification ("Demotion")

        The April 30, 2002 letter, however, occurred within a relatively short time period from

Plaintiff's job reclassification to justify the Court's further inquiry.  However, mere temporal

proximity is not enough to establish retaliatory motive.  Butler v. City of Prairie City, Kan., 172

F.3d 736, 744 (10th Cir. 1999).  Plaintiff must present some evidence that Defendants acted with

a culpable, i.e., retaliatory, subjective state of mind.  Seeds v. Lucero, 177 F.Supp.2d 1261, 1270

(D.N.M. 2001).

        It is undisputed that Plaintiff's job reclassification was solely Besett's idea.  In informing

the Board of her decision, she characterized the reclassification as a way to improve the bilingual

education program.  Pltff's Set 2, p. 7.  Besett summed up her discussion with Plaintiff concerning

the reclassification in a memo:

28

> I knew that you felt overwhelmed  and knew that your passion was bilingual education.
> By creating two positions rather than one, I felt that you would be able to be successful.  I
> shared with you that I wanted you to feel good about coming to work and be able to focus
> on continually improving the bilingual program. . . I felt our meeting was productive, and I
> stressed the importance of working together to make a difference with students.

Ex. to SMF 19. Besett's description of Deschenie as feeling "overwhelmed" is supported by

Plaintiff's own testimony.  Deschenie had frequently asked Besett for support help, which was

denied.  Deschenie Depo. at 99-101, 106, 144; Pltff's Set 2 at 841.  Yet Plaintiff contends that

Besett retaliated against her when Besett decided to modify Plaintiff's job so that Plaintiff could

perform more of the duties she enjoyed while working at the same salary and benefits.

Deschenie concedes that Besett approached her first to discuss her feelings about splitting

the job position.  Besett gave her copies of the two job positions, confirmed with Plaintiff that she

was feeling overwhelmed in her job, and that her "passion" was bilingual education.  Besett asked

for Deschenie's feedback about the position as soon as possible.   Ex. to SMF 18, Reply.

Plaintiff felt that the reclassification was a "demotion" because as Director of Bilingual Education

she would not be involved with the bilingual budget and because Besett would not give her a

choice about which position to take.  However, based on Plaintiff's failures to timely submit the

funding applications, Besett's decision was reasonable and justified.

The record does not contain any evidence which would suggest retaliatory motives on the

part of Besett or any of the Defendants as a result of the April 30, 2003 published letter, or for

that matter any alleged protected speech Plaintiff made, in connection with Plaintiff's job

reclassification.  By the time Deschenie was evaluated on July 1, 2003, Besett found Deschenie's

job performance wanting in the areas of managing resources, working productively with others

and adhering to established timelines and procedures, as described  in the growth plans.  Exs. to

SMF 22, 28, 32.[7]   The undisputed facts indicate that there were ongoing problems with Plaintiff's job performance in those areas.

Besett felt that Deschenie had criticized her and "and had not been honest" with Besett in her stand on bilingual education.  Besett Depo. at 225.

Besett also believed that Deschenie was feeding pieces of misinformation about the bilingual program to an Indian Education Committee member who published an article in the newspaper containing false and defamatory statements concerning Besett.  Besett Depo. at 231, 233.   Plaintiff alleges that the counterclaim for libel which Besett filed in this case (and subsequently withdrew, see Doc. 32) shows retaliatory motive by Besett.  This evidence actually cuts both ways, since it just as easily supports Defendants' position that Deschenie had problems working with, rather than against, the administration of the school district by which she was employed.

Deschenie's May, 2003 grievance and Besett's response to that grievance provides a fair representation of the concerns Besett had about Plaintiff's job performance.  Ex. to SMF 19 (June 2, 2003).   Besett felt that Deschenie was not "moving forward" with the program by working cooperatively within the administration to change any negative perceptions that were held. Instead, Besett felt that Plaintiff was "dwelling on a statement made by a board member [Manning's comments concerning the bilingual education program]," despite assurances by Besett and the Board that the program would not be eliminated.  SMF 19 at 3.   In her deposition, Plaintiff conceded that the Board issued a public statement of support for bilingual education in

---

[7]   Based on the evidence which the Court reviews below, there is also no evidence of a connection between the growth plans completed on Plaintiff and any adverse action taken, even if the growth plans could be considered adverse actions.

June of 2003.  Deschenie Depo. at 27:15-17, see also Ex. to SMF 8 ("[CCSD] Supporting

Statement for Bilingual Education").

  In response to Deschenie's allegation in her grievance that she was being blamed for

negative perceptions in the school district concerning the bilingual education program, Besett

reminded Plaintiff that she was directly responsible "to correct any erroneous information being

presented."   As an example, Besett noted at a program planned by Plaintiff, Deschenie did not

correct a statement concerning the future of the bilingual education program made by a member

of a student panel which left "an erroneous impression with those in attendance."  Ex. to SMF 19

at 3.  Besett informed Plaintiff that if she felt that she was treated differently, it was because

Besett had been "overlooking" issues involving Plaintiff that she did not overlook with other

"central office administrators." SMF 19 at 2 & 5 ("I have had a tendency to treat you differently

and to hold you to a less rigorous compliance than other directors").  Besett also found it

"offensive" that Plaintiff made comments during the work session about the amount of time

Deschenie devoted to her responsibility, where "[m]any central office administrators exceed the

amount of time you devote."  SMF 19 at 7.

  Besett's response to Plaintiff's grievance also brought up the May 15th Board session in

which Board members commented on Plaintiff's April 30th letter to the newspaper.  Besett

informed Plaintiff that Board members had the right to address the content of a letter when that

letter was written as a representative of the school district without first seeking approval.   In

response to Deschenie's complaints that she had been "yelled at and humiliated" at the meeting,

Besett responded: "You were asked specific questions and were having difficulty answering them.

At times, you appeared to be taunting Mr. Manning, Mr. King and Mr. Ray."  Ex. to SMF 19 at

2.

Regarding the portion of Plaintiff's grievance concerning her First Amendment right to write letters to newspapers, Besett responded by telling Deschenie that she had an obligation to follow the Board's direction when she represented the district:

> Your first amendment rights are respected when you are representing yourself.  In the Letter to the Editor discussed with you on May 15, 2003, you referenced yourself as being the Indian/Bilingual Education Director for the District.  If you had not stated in the letter that your views were representative of the District's administration by how you signed it, the Board would not have questioned your behavior.

Ex. to SMF 19 at 6.   Besett also found it ". . . interesting that you want your First Amendment rights protected but do not feel that board members have the same rights."  Ex. 19 p. 3.

Defendant Manning sent Besett a written response to the accusations in Plaintiff's grievance which involved him.  Manning apologized for his tone and manner of his demeanor at the May 15th Board session, but felt the content of his statements was correct.   Manning stated that Plaintiff "continues to put her own interpretation to the comments that I made. . . She and others ran with something that was totally out of context."  Ex. to SMF 19.  Manning noted that the Board had approved the public statement regarding support for the bilingual program.

Deschenie alleged in her grievance that she heard "disparaging comments about the value of Navajo language instruction from the Board president and other Board members."   Ex. to SMF 17.  Manning responded to this allegation by stating:

> When classroom teachers speak of children being pulled out of core subjects to go to "bilingual" and time after time, they come back to class with art projects rather than language exercises, and children say that is what they always do, it makes me question 'Navajo language' instruction.  When bilingual instructors don't attend parent-teacher conferences, no accountability by posting grades on report cards, I wonder about the 'program.'  Ms. Deschenie is also good at making 'disparaging remarks' about regular classroom instruction being why Navajo Language in early grades do not show proficiency.

Ex. to SMF 17(#8).

With regard to Deschenie's allegation that the Board violated her First Amendment rights, Manning responded that "Ms. Deschenie may write anything she wishes as long as she doesn't use her title for the District."  Ex. to SMF 17(#9).  And, in response to Plaintiff's feeling that she was being "blamed" for negative perceptions of the bilingual program, Manning stated: "respect is two way street. Must give to receive."  Ex. to SMF 17(#3).

To defeat a summary judgment motion, the non-movant  must do more than simply show that there is some "metaphysical doubt as to the material facts." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986)).  Plaintiff has not presented any evidence from which a jury could infer that Besett reclassified her job position because of the April 30th letter Plaintiff had written to the Farmington Daily times.

B.    Discharge

Plaintiff's discharge qualifies as an adverse action under the First Amendment, but it suffers from a major infirmity.  The time interval between the last of Plaintiff's protected speech, April 30, 2003 and her discharge is almost six months – too long to suggest that the discharge was connected to the April 30th letter.  Moreover, just as there is no evidence that Plaintiff's April 30th speech was a factor which resulted in her job reclassification, there is also no evidence that the letter was a substantial or motivating factor in her discharge.

On July 1, 2003, Deschenie was rated as unsatisfactory in three areas: managing resources, working productively with others and adherence to established timelines and procedures.  Plaintiff's growth plan was reviewed twice by the end of September, 2003, and

Besett still felt at that time that Plaintiff had not met the objectives of the plan.  At the August review, Plaintiff was warned that termination was a possibility if she did not make "immediate and sincere efforts" to meet the objectives.  Exs. to SMF 22, 28, 32.   Plaintiff was again warned at the September review that "failure to make substantial progress in meeting the objectives of your growth plan by that time *will* result in termination or discharge." Ex. to SMF 32.

Deschenie does not dispute that she failed to timely submit the funding applications, or to complete the tasks which Besett assigned her at the end of September 2003.  Instead, she attempts to present evidence that Besett's perceptions of her were unjustified, and therefore that it is likely that retaliatory motive was a factor in her discharge.  Plaintiff offers no excuses for the untimeliness of the applications prior to July, 2003, such as those involved in the inquiry from the New Mexico State Department of Education after an extension had already been given.  However, Plaintiff claims that she did not participate in the final preparation of the applications at the end of July 2003 because her responsibility in that regard ended when her position was split at the beginning of that month.  Plaintiff blames any delay in the application process on the fact that her replacement had not begun work yet.  Yet, Deschenie's own statements do not support her contention that the untimeliness of the applications was due to her would-be replacement's failure.  Plaintiff *was* told in early July that the replacement would be starting the following week to continue the application process, but was told soon after that the replacement would not be starting before the end of the following month.  Deschenie Depo. at 133-35.  A few days' delay in an application process that had been ongoing for a period of time (during which Plaintiff was responsible for the process) does not create an issue of material fact as to motive for Plaintiff's discharge.  Further, all the evidence in the record points to the fact that Deschenie was never

34

relieved of the responsibility for timely submission of the applications.  On June 28, 2003, Besett

sent Deschenie a memo to inform her that interviewing for the Indian Education Coordinator

would begin that week.  Besett also specifically informed Plaintiff that she would

> *need to continue* the routine operations of the [funding application process] until a
> coordinator is employed *and has become familiar with the responsibilities*.  It will be
> important that you assist the new coordinator as the transition of responsibilities is made.

Ex. to SMF 21 (emphasis added).

Besett was forced to become involved in the application process in order to turn them in

on time and not endanger the school's funding for the bilingual education program.  Plaintiff

contends that Besett's involvement in the applications was "part of her job."  Response at 9.

However, this statement of fact does not create a triable issue.  Besett, as School Superintendent,

may have been ultimately answerable to the district, but Plaintiff concedes that it was her

responsibility to make sure the applications were correct and completed by the due date.

Deschenie Depo. at 11.   Plaintiff's delay in doing this part of her job necessarily increased the

level of Besett's involvement in the process.

Similarly, Deschenie attempts to shift the blame for her failures to complete the tasks

assigned by Besett in late September 2003.  She claims that all the data was not in, or that other

individuals had not completed their data-entry tasks on which she relied to obtain information for

the applications.  Plaintiff's excuses are not supported by any evidence.  Moreover, it is Besett's

perception as an employer that matters, not Plaintiff's "subjective evaluation of her own relative

performance."  Shorter v. ICG Holdings, Inc.,Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1208

(10th Cir. 1999).  The record is replete with documentation of the shortcomings of Plaintiff's job

performance, as well as ample warnings Plaintiff was issued prior to discharge about the

performance objective she was required to meet.  Based on this evidence, the Court finds that Besett's appraisal of Deschenie's failures was reasonable, that Plaintiff offers no material fact to rebut that appraisal, and that Plaintiff was not discharged because she had engaged in protected speech.

## IV.    Same Decision Would Have Been Taken

Defendants also argue that the evidence shows that Plaintiff's position would have been reclassified, and eventually Plaintiff would have been discharged even in the absence of Plaintiff's speech.  The same evidence which the Court has found to lack any indication of retaliatory motive also convinces the Court that Defendants' contention is well-founded and correct.

## V.    Individual Defendants

Plaintiff concedes that Defendants Mortensen and Nicholsen took "relatively few" of the actions that were taken against her  -- although the Court finds it difficult, if not impossible, to find where Plaintiff alleges *any* action taken by these two Defendants against Plaintiff. Nevertheless, Plaintiff argues that Defendants Mortensen and Nicholsen are individually liable to Plaintiff because they exercised final policymaking authority which was delegated to them by Besett.   The Court need not address this point, since the Court has found that Besett did not violate Plaintiff's First Amendment rights.

### Conclusion

In sum, the Court finds that Plaintiff engaged in some speech which survived the <u>Pickering</u> balancing inquiry and is thus protected by the First Amendment, and that Plaintiff suffered adverse employment actions by Defendants, namely her discharge, and possibly her job reclassification. However, Plaintiff has presented no material issue of fact which would suggest that any of her

protected speech was a substantial or motivating factor for either her job reclassification or her

discharge.  The Court further finds that Plaintiff's job position would have been reclassified, and

she would have been discharged, even if Plaintiff had not engaged in protected speech.

     **THEREFORE,**

     **IT IS ORDERED** that: (1) Defendants' Motion for Summary Judgment as to Claims of

Quintina Deschenie **(Doc. 85)** is hereby **GRANTED**; (2) the Court's ruling on the claims of

Plaintiff Deschenie, who was the last remaining Plaintiff in this action, effectively disposes of all of

Plaintiffs' claims against Defendants; and (3) A Judgment in accordance with this Memorandum

Opinion and Order shall issue.

                      _____

                      UNITED STATES DISTRICT JUDGE